**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

STACIE STEPHENSON, on behalf of
ZACHARY STEPHENSON,

       Plaintiff,

v.                                                                    No. CIV 98-762 BB/DJS

THE UNITED STATES OF AMERICA,

       Defendant.


**<u>OPINION</u>**

THIS MATTER comes before the Court for consideration of cross-motions for summary judgment filed by the parties (Docs. 57, 64, 72). The Court has reviewed the submissions of the parties and the relevant law, and, for the reasons set forth below, finds that Defendant's motion will be denied, and Plaintiff's motion granted.

This is a Federal Tort Claims Act ("FTCA") case that has been before the Court once before, on a motion to dismiss. Plaintiff is suing on behalf of her son, Zachary, who was born in a military hospital on June 9, 1994, and suffered a condition called shoulder dystocia, in which the baby's shoulder is caught in the mother's pubic bone. As a result of this difficulty Zachary incurred an injury called a brachial plexus injury, or Erb's palsy. Due to this injury Zachary suffered a partial loss of use of his arm. As Plaintiff was informed at the time of the injury, in many cases this condition heals quickly, but in Zachary's case it did not. Zachary's primary care physician, Dr. Carroll, who was also the physician who delivered him, referred Zachary to a civilian specialist who had experience with Erb's palsy patients. Dr. Carroll also authorized twice-a-week physical therapy sessions for Zachary, at a civilian facility. Since Plaintiff had to drive 98 miles each way for the physical therapy, Plaintiff

applied for a transfer to a different air force base where she could be closer to medical treatment for Zachary.  This transfer, to Albuquerque, was granted in April 1995, over ten months after Zachary was born.  The transfer ended any involvement Dr. Carroll had in treating Zachary's injury.  In Albuquerque, Plaintiff was informed for the first time that Zachary's condition would not improve further, and that he should have surgery.  Zachary did have surgery, but it is not clear from the record how successful that surgery was.

In March 1997, two years and nine months after Zachary's birth, Plaintiff filed an administrative claim for malpractice.  That claim was denied, and Plaintiff filed this lawsuit in 1998 under the FTCA.  The United States moved to dismiss, arguing the statute of limitations had run because Plaintiff's administrative claim was not filed within two years of Zachary's birth.  *See* 28 U.S.C.A. § 2401(b) (tort claim against United States is barred unless it is presented in writing to the appropriate federal agency within two years after such claim accrues).  The Court denied the motion to dismiss, because there was evidence that Dr. Carroll and the specialist had both assured Plaintiff that Erb's palsy almost always resolves itself, and had told her Zachary's condition was improving. *See McDonald v. U.S.*, 843 F.2d 247 (6th Cir. 1988) (discussing "blameless ignorance" tolling theory).[1]  The United States has now renewed its effort to obtain dismissal of the case, with this motion for summary judgment.  The parties have agreed that Plaintiff's response to the motion should be construed as a cross-motion for summary judgment on the limitations issue.

The United States argues that it does not matter whether Plaintiff was misinformed about the extent or permanence of Zachary's injury; the only relevant facts are that she was told of the injury

---

[1]There is a factual conflict as to whether Plaintiff was told Zachary could expect a full recovery.  For summary-judgment purposes, therefore, the Court has assumed she was not told a full recovery would occur, but was informed only that improvement in Zachary's condition could be expected.

2

and how it happened, immediately after Zachary was born. Therefore, according to the government, the limitations period began running on the day of Zachary's birth. In response, Plaintiff does not rely on the physicians' representations to Plaintiff regarding Zachary's condition. Instead, she raises three arguments against dismissal: (1) the limitations period was tolled pursuant to the "continuous treatment" doctrine; (2) the limitations period should not be applied to a minor, particularly a baby such as Zachary, because minors should receive the same treatment as incompetent individuals; and (3) if the limitations period is not tolled for minors, Zachary's right to equal protection and due process will be violated.

**Discussion**

**Continuous Treatment Doctrine:** The continuous treatment issue involves two separate questions in this case. The first is, what form of the continuous treatment tolling doctrine, if any, should the Court apply? The second is, if the doctrine is applied in this case, does Dr. Carroll's referral of Zachary to the specialist and to physical therapy interrupt the treatment provided by Dr. Carroll, and therefore end the tolling of the limitations period? Each question will be discussed separately.

The continuous treatment doctrine is an exception to the strict discovery rule of *United States v. Kubrick*, 444 U.S. 111 (1979), in which the Supreme Court held that a medical malpractice case accrues under the FTCA when the claimant first knows of the injury and its cause. Under the continuous treatment rule, the limitations period for filing a claim is tolled, under certain circumstances, for the period during which the injured party is receiving continuous treatment for the injury caused by the defendant's alleged negligence. *See Miller v. United States*, 932 F.2d 301 (4th Cir. 1991). According to one law review article, the rule has been adopted in at least twenty states-- three by statute, and seventeen by case law. David W. Feeder, III, *When Your Doctor Says, "You*

3

*Have Nothing to Worry About," Don't Be So Sure:  The Effect of Fabio v. Bellomo on Medical Malpractice Actions in Minnesota*, 78 Minn.L.Rev. 943, 954 (1994).  There are not a great number of federal cases discussing the doctrine, but there are enough to identify two main lines of cases, one which is quite restrictive and one more expansive in applying the rule.

According to the cases, there are two main reasons for applying some version of the continuous treatment rule.  One concerns the patient's ability to discover the facts surrounding her injury, while she is still being treated by the same doctor who caused the injury in the first place. Courts have stated that it is not reasonable to expect a patient under the continuing care of a doctor to be able to recognize that the doctor's actions may have caused her injuries, because the doctor may conceal information from the plaintiff, and the patient will be reluctant to question her doctor while she is still under the doctor's care.  *See Ulrich v. Veterans Admin. Hosp.*, 853 F.2d 1078, 1080 (2d Cir. 1988).  The second main reason given by courts for applying the continuous treatment rule is a more pragmatic one--courts want to prevent interference in the doctor-patient relationship, as long as it exists, and want to give the doctor an opportunity to treat and heal any injury the doctor may have caused.  As the *Ulrich* opinion states, some courts feel it is "absurd" to require the plaintiff to interrupt corrective treatment in order to immediately commence legal proceedings.  These opinions emphasize the trust and confidence placed in doctors by their patients.  *Id.*  In other words, these courts do not want any disruption of the treatment that could end up healing the patient, thus avoiding a significant problem later and a lawsuit altogether.

Courts which subscribe only to the first purpose of the continuous treatment rule by necessity apply the rule more restrictively than the courts that accept the second purpose also.  This is because, if discovery by the plaintiff is the main focus of the rule, there is no reason to apply the rule if the plaintiff already knows an injury has occurred and already knows of the cause of the injury.  The

Ninth Circuit has put it this way, several times: where the patient knows of the injury and knows what acts caused the injury, the continuous treatment rule will not apply. *Migliore v. United States*, 1997 WL 787476 (9th Cir.); *Outman v. United States*, 890 F.2d 1050, 1053 (9th Cir. 1989); *Ashley v. United States*, 413 F.2d 490, 493 (9th Cir. 1969); *see also Tyminski v. United States*, 481 F.2d 257, 264, n. 5 (3d Cir. 1973) (rejecting continuous treatment exception, because there is "no value in the contention that a person who knows of the existence of the acts upon which his claim ... is based may nevertheless forestall bringing suit until the treatment for the injuries is complete").

It could be argued that this version of the rule is simply an outright rejection of the rule; if the plaintiff does not know what caused the injury, there is no reason to apply the continuous treatment rule, because even under the usual discovery rule, the cause of action will not accrue until the patient learns the cause of the injury. In some state cases, however, this version of the rule has been given some utility and applied where it is not clear what particular acts of the doctor caused the injury, because the injury occurred at some unidentified point during the continuous treatment by the physician. Under those circumstances, the limitations period will not begin to run until the course of treatment is finished. *See, e.g., Lane v. Lane*, 752 S.W.2d 25, 26-28 (Ark. 1988). Also, some courts have held that the rule, while having no utility when the tort victim has actual knowledge of the injury and its cause, is relevant to whether the victim should have discovered, through due diligence, the cause of the injury. *See Hunter v. United States*, 2000 WL 1880257 (M.D.Penn.). At most, then, this version of the continuous treatment doctrine provides some assistance to a plaintiff whose knowledge of the injury and the cause of the injury is in doubt.

Under the "more robust conceptualization" of the rule, *see Hunter*, focusing on the physician-patient relationship and the desirability of encouraging patients to finish a course of treatment for their injury, it is irrelevant whether the patient knows of the injury and its cause. As long as the patient

5

remains under continuous treatment for the injury, by the same physician or under that physician's general control, the statute of limitations will be tolled.  *See Ulrich*; *Wehrman v. United States*, 830 F.2d 1480, 1483 (8th Cir. 1987); *Otto v. National Institute of Health*, 815 F.2d 985, 988 (4th Cir. 1987); *Tolliver v. United States*, 831 F.Supp. 558 (S.D.W.Va. 1993).  These opinions all cite the "trust and confidence" placed in physicians by their patients, and the desirability of not requiring interference in that relationship, so as to facilitate proper treatment of the injury.  Several states follow this version of the rule.  *See Casey v. Levine*, 621 N.W.2d 482, 488 (Neb. 2001) (it is apparent that allowing a physician an opportunity to correct any malpractice and not disrupting the physician-patient relationship are the primary considerations underlying the continuing treatment doctrine in Nebraska); *McDermott v. Torre*, 437 N.E.2d 1108, 1112 (N.Y. 1982) (policy underlying continuous treatment doctrine seeks to maintain physician-patient relationship in the belief that the most efficacious medical care will be obtained when the attending physician remains on a case from onset to cure); *Swang v. Hauser*, 180 N.W.2d 187, 189-90 (Minn. 1970) (policy reason for doctrine is that patient must repose reliance on his physician in completion of the course of curative treatment).

The Tenth Circuit has said little about the continuous treatment doctrine.  In one case, discussing when a limitations period began to run, but not addressing the continuous treatment doctrine, the Court cited the Ninth Circuit's *Outman* case and included a parenthetical describing *Outman's* holding, that the "'continuous-treatment doctrine' is not available to toll the FTCA statute of limitations when plaintiff knows what acts caused the alleged injury." *Bradley v. Veterans Admin.*, 951 F.2d 268, 271 (10th Cir. 1991).[2]  In another opinion, the Tenth Circuit rejected application of

---

[2]It is not surprising that *Bradley* did not discuss the continuous treatment doctrine, since the plaintiff did not argue it and there are no facts stated in the opinion that might support such a theory. Instead, the *Bradley* opinion addressed only the issues of when the plaintiff knew of his injury and whether the limitations period was tolled until the plaintiff was informed that the injury was negligently inflicted.  *Id.*

the continuous treatment doctrine with respect to that particular case, because the "continuous treatment doctrine tolls the statute of limitations only 'so long as the claimant remains under the 'continuous treatment' of a physician whose negligence is alleged to have caused the injury.' " The Tenth Circuit then cited *Miller* and *Ulrich* for that proposition, and held there was no continuous treatment in the case at bar. *Espinoza v. United States*, 1996 WL 249488 (10th Cir.). Neither *Bradley* nor *Espinoza* can be considered authoritative pronouncements as to whether the doctrine would be adopted by the Tenth Circuit, and if so in what form. This is so because neither opinion addressed the issue at all. Furthermore, the Tenth Circuit has now cited without discussion one case, *Outman*, which espouses the restrictive view of the doctrine, and two cases, *Miller* and *Ulrich*, that follow the more expansive view. The Court must therefore decide the issue without the benefit of controlling authority from the Tenth Circuit.

Plaintiff relies heavily on *Irwin v. Dep't of Veterans Affairs*, 498 U.S. 89 (1990). In *Irwin*, the Court held that equitable tolling should be available in suits against the United States to the same extent it is available in suits against private individuals, unless Congress provides otherwise. 498 U.S. at 95-96. Although *Irwin* was decided in a different context, it has since been expressly applied to FTCA cases. *See Perez v. United States*, 167 F.3d 913, 915-917 (5th Cir. 1999) (*Irwin* undid the old rule that equitable tolling was never available against the government; after *Irwin*, such tolling applies to FTCA cases; discussing two other Circuit cases reaching same result, although through "flawed" reasoning). However, simply because under *Irwin* equitable tolling is available against the government, does not mean the continuous treatment doctrine must be accepted. *Irwin* does not require federal courts to apply any and all possible tolling theories. As discussed above, the continuous treatment doctrine has been accepted in expanded form by the Second, Fourth, and Eighth

Circuits.  It has been rejected, or at least severely limited, in the Third and Ninth.  After reviewing this case law, the Court finds the former line of authority more persuasive.

There is clearly a common-sense appeal to the idea that patients should be encouraged to follow a course of treatment for a period of time, without poisoning the physician-patient relationship by investigating possible malpractice or filing a claim.  This is especially true where, as here, the patient is being told complete recovery often occurs, and the patient is exhibiting continuous (albeit slow) improvement.  Encouraging patients to trust in the treatment and continue it will facilitate a more complete recovery, possibly leading to fewer malpractice cases.  At minimum, the damages suffered by a patient may be lessened considerably.  Where it is possible that continued treatment may eliminate the injury suffered by the patient, there is no reason to force the filing of a claim just to avoid the running of the limitations period.  Furthermore, if the limitations period is not tolled during a course of continuous treatment, litigation-minded patients who begin immediately to investigate and plan a lawsuit will be rewarded by having a longer period of time in which to act, as compared to patients who in good faith follow the physician's recommendations for treatment.  The Court therefore will adopt and apply the continuous treatment doctrine as it is explained in *Miller* -- the statute of limitations does not begin to run on a medical malpractice claim upon the claimant's initial discovery of an injury and its cause, as long as the claimant remains under the continuous treatment of the physician whose negligence is alleged to have caused the injury.  932 F.2d at 304.

**Effect of Referral to Specialist and to Physical Therapy**

The Court must now determine how the continuous treatment doctrine applies in this case; that is, when did the continuous course of treatment of Zachary's arm, by Dr. Carroll, end, so ending the tolling of the limitations period?  As noted above, Dr. Carroll did not remain Zachary's exclusive treatment provider once the Erb's palsy was diagnosed.  Instead, he referred Zachary to a civilian

8

specialist and a civilian physical therapist.  However, Dr. Carroll, as the primary care physician, was required to provide authorization for the specialist's treatment, including all visits to the specialist. Dr. Carroll also had to authorize the course of physical therapy Zachary went through.  Furthermore, the specialist provided Dr. Carroll with updates concerning Zachary's condition, after each visit. Finally, Dr. Carroll's medical records show that he continued to examine Zachary's arm and write comments about it, even after referring Zachary to the specialist, when Zachary came in to see him for other complaints or check-ups.  The last such comment by Dr. Carroll appears to have been written in February 1995, shortly before Plaintiff moved to Albuquerque.

The purposes of the continuous treatment doctrine, to prevent jeopardy to the physician-patient relationship, are just as important here as they would be if Dr. Carroll had continued to be the sole doctor treating Zachary.  Given the power primary care physicians have over referrals, it was critical to Zachary's optimal recovery that he receive the physical therapy he did and the treatment from the specialist that he did.  Getting involved in a malpractice claim against Dr. Carroll could have endangered the referrals Zachary was receiving for that therapy and treatment.  Under the facts of this case, given Dr. Carroll's continued direct involvement in evaluating Zachary's progress as well as his control over the treatment of Zachary by the other health-care providers, it makes no difference that Dr. Carroll referred Zachary to the specialist and to the physical-therapy provider.  *See Otto* (where NIH physicians remained involved in the plaintiff's treatment, even from a distance, through consultations with physicians treating the plaintiff directly, continuous course of treatment was not interrupted); *see also Keith v. Schulman*, 696 N.Y.S.2d 514, 515 (1999) (under New York law, the continuing trust and confidence placed in the original treating physician did not end when physician referred patient to an eye specialist, and continuous course of treatment was therefore not interrupted).  The Court will hold that Dr. Carroll's continuing treatment of Zachary's arm did not

9

end until Plaintiff moved to Albuquerque in April 1995, and Zachary's visits to the physical therapist and the specialist ceased. At that point, the limitations period began to accrue, and Plaintiff's March 1997 claim was therefore timely presented to the government.

**Plaintiff's Other Arguments**

Given the Court's disposition of the issue concerning the continuous treatment doctrine, it is not necessary to address these arguments. The Court notes, however, and Plaintiff acknowledges, that each argument would require the Court to directly or indirectly ignore the controlling Tenth Circuit precedent found in *Robbins v. United States*, 624 F.2d 971 (10th Cir. 1980). This the Court cannot do.

**Conclusion**

Based on the foregoing discussion, the Court will apply the continuous treatment doctrine in this case. The Court will also find the continuous treatment of Zachary, for his arm injury, by Dr. Carroll, did not end until April 1995. Therefore, the Court will find Plaintiff timely presented her claim in this case. Defendant's motion for summary judgment will be denied, and Plaintiff's motion for summary judgment on the limitations issue will be granted.

**ORDER**

Pursuant to the foregoing opinion, Defendant's motion for summary judgment (Doc. 57) is hereby DENIED, and Plaintiff's cross-motion for summary judgment (Docs. 64, 72) is hereby GRANTED.

Dated this 14th day of June, 2001.


BRUCE D. BLACK
United States District Judge


**Attorneys**
**For Plaintiff**
Stephen T. LeCuyer
Mettler & LeCuyer, P.C.
4308 Carlisle N.E., #208
Albuquerque, New Mexico 87101

**For Defendant**
Elizabeth M. Martinez
Assistant United States Attorney
P.O. Box 607
Albuquerque, New Mexico 87103

11